## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| KATHY L. GANDY, individually and on behalf of The Estee Lauder Companies 401(K) Savings Plan, | : : : : : | CIVIL ACTION NO.: 1:20-cv-5779 |
| Plaintiff, | : : | |
| v. | : : | |
| ESTEE LAUDER, INC., THE BOARD OF DIRECTORS OF ESTEE LAUDER INC., ESTEE LAUDER INC. FIDUCIARY INVESTMENT COMMITTEE, and JOHN DOES 1-30, | : : : : : : | |
| Defendants. | : : | |

## CLASS ACTION COMPLAINT

Plaintiff Kathy L. Gandy ("Plaintiff"), by and through her undersigned attorneys, on behalf of The Estee Lauder Companies 401(k) Savings Plan ("Plan"),[1] herself and all others similarly situated, alleges as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against the Plan's fiduciaries, which include Estee Lauder, Inc., ("Estee Lauder" or the "Company"), the Board of Directors of Estee Lauder and its members ("Board") during the Class Period (defined below), and the Estee Lauder Inc. Fiduciary Investment Committee, and its members ("Committee") during the Class Period for breaches of their fiduciary duties. Defendants Estee Lauder, the Board and the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Committee are referred to collectively as "Defendants".

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which **$5.6 trillion was held in 401(k) plans**. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).[2]

3.     In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

---

[2] Available at: https://ici.org/research/stats/retirement/ret_20_q1 (last visited July 2, 2020).

6.       As of December 31, 2018, the Plan had $1,645,339,326 in assets, which qualifies it as a mega plan in the defined contribution 401(k) marketplace. As a mega plan, the Plan has substantial bargaining power regarding the fees and expenses that are charged against participants' investments. However, to the extent that Defendants made any attempt to reduce the Plan's expenses or to monitor and review the Plan's investment options, they employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to participants were reasonable, and (b) that each investment option that was offered in the Plan was prudent.

7.       During the proposed Class Period (June 22, 2014 to the present) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, Plaintiff, and the Plan's other participants by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

8.       Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.       Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

II.     **JURISDICTION AND VENUE**

10.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

11.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the Plan is administered, where at least one of the alleged breaches took place and where Defendants reside.

III.     **STANDING**

13.     An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *LaRue*, 552 U.S. at 254. 29 U.S.C. § 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continuing losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff. To the extent the Plaintiff must also show an individual injury, even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, Plaintiff has suffered such an injury, in at least the following ways:

14.     Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent investment options in the Plan because Defendants' selection and retention of those

options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

15.    Plaintiff's individual account in the Plan was harmed because she invested in investment options that would have been removed from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

## IV.    PARTIES

### Plaintiff

16.    Plaintiff Kathy L. Gandy, a resident of Livingston, Texas, has been employed by Estee Lauder since 2008. During her employment, Plaintiff Gandy has participated in the Plan and invested in the following options offered by the Plan: JPMorgan SmartRetirement 2020 fund ( bps); JPMorgan SmartRetirement 2025 ( bps); Loomis Sayles Core Plus Bond fund ( bps); SSgA S&P 500 Index fund ( bps); Fidelity Growth Company fund ( bps); and Dodge & Cox US Equity Fund ( bps).[3]

17.    Plaintiff did not have knowledge of all material facts (including, *inter alia*, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, and information regarding other available share classes, necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until

---

[3] The expense ratios for Plaintiff's Plan investments are in parentheses and expressed in basis points, which is one hundredth of a percent or equivalently 0.01%.

shortly before this suit was filed.

18.     Further, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. Plaintiff did not, and could not, review the Committee meeting minutes or other direct evidence of Defendants' fiduciary decision making, or the lack thereof. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## Company Defendant

19.     Estee Lauder, which maintains its principal place of business at 28 W. 23rd Street, 8th Floor, New York, New York, is the Plan sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Estee Lauder is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) acting through the Board, it appointed the Committee to serve as a fiduciary of the Plan.

20.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

21.     At all times relevant to this action, Estee Lauder has been responsible for the administrative and investment responsibilities associated with the Plan and has been the "named fiduciary" as defined under ERISA.

**Board Defendants**

22.     The Board of Directors appointed the members of the Committee. Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

23.     Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

24.     The Board and its members during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

25.     On information and belief, the Committee is appointed by the Board and is responsible for selecting the funds which are available to Plan participants for investment. Additionally, the Committee is charged with the responsibility to review the Plan's investment options on an annual basis.

26.     The Committee is governed by the Investment Policy Statement which further details the Fiduciary Committee's responsibilities. The Estee Lauder Companies 401(k) Savings Plan Trust Investment Policy Statement Updated as of March 2019 ("IPS"). The IPS provides that the Fiduciary Committee "has responsibility for assisting in the administration of the Plan with respect to investment matters, including the following matters: evaluating investment options; and selecting investment options." IPS at 2.

27.     The Committee is also responsible for appointing the Plan trustee. The Plan Document provides: "[t]he Fiduciary Committee shall have the authority to … choose the Trustee." *Id*.

28.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

29.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

30.     To the extent that there are additional officers and employees of Estee Lauder who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Estee Lauder officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## V.     THE PLAN

31.     The Plan is a defined contribution 401(k) plan covering substantially all regular full-time employees who have completed 30 days of service, in the U.S. and Puerto Rico …." Estee Lauder Companies 401(k) Savings Plan Notes to Financial Statements for December 31, 2018, at 5 ("2018 Auditor Report").

32.     The Plan is a "defined contribution" or "individual account" plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

*Eligibility*

33.    Employees of Estee Lauder and its subsidiaries are eligible to participate in the Plan when they "have completed 30 days of service … as defined in the Plan document" *Id*. The Plan Document provides: "[e]very Employee regularly scheduled to work at least 30 hours per week and who is not a temporary employee shall be eligible to participate hereunder 30 days after his date of hire…." Plan Doc. at 12.

*Contributions*

34.    Participants may contribute to their individual accounts by way of:

- salary deferral contribution;

- employer matching contribution; and

- rollover contributions from other defined contribution plans.

35.    With regard to employee contributions, a participant may contribute from 2% to 50%, in 1% increments, of their compensation through payroll deduction. 2018 Auditor Report at 5. Estee Lauder matches 100% of an employee's contributions up to the first 3% of eligible compensation and 50% of a participant's contributions on the next 4% of eligible compensation. *Id*.

36.    Under the Plan, a participant is 100 % vested in their salary deferral contributions and any rollover account contributions, regardless of the length of service. 2018 Auditor Report at

6. "Participants are also immediately vested in the Company's matching contributions, and any investment earnings thereon." *Id*.

### The Plan's Investments

37.    Various funds were available to Plan participants for investment during the Class Period, including JPMorgan SmartRetirement target date funds. The Committee is responsible for determining the appropriateness of each of the Plan's investment options and monitors investment performance.

38.    According to the Plan's reports on Form 5500, the Plan's assets under management for all funds was $1,645,339,326 as of December 31, 2018,

## VI.    CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 22, 2014 and the present (the "Class Period").

40.    The members of the Class are so numerous that joinder of all members is impractical. According to the 2018 Form 5500 filed with the U.S. Department of Labor, there were 7,030 Plan participants with account balances, as of December 31, 2018.

41.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members, and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein,

---

[4] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

and all members of the Class have been similarly affected by Defendants' wrongful conduct.

42.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are fiduciaries of the Plan;
B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;
C.    Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
D.    The proper form of equitable and injunctive relief; and
E.    The proper measure of monetary relief.

43.    Plaintiff will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

44.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

46.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

47.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

48.     As described above, Defendants were fiduciaries of the Plan because:

    A.    they were so named; and/or
    B.    they exercised authority or control respecting management or disposition of the Plan's assets; and/or
    C.    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or
    D.    they had discretionary authority or discretionary responsibility in the administration of the Plan.

49.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

50.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

51.    "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

52.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

53.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S.

409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA

a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that

exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in

selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to

act as a prudent man simply by arguing that other funds...could theoretically, in combination,

create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF,

2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497

F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

54.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by

co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances: (A) if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such an act or omission
> is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C.
> §1104(a)(1), in the administration of his specific responsibilities which give rise to
> his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (C) if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

55.    During the Class Period, Defendants did not act in the best interests of the Plan's

participants. Investment options chosen for a plan should not favor the fund provider over the

plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries,

the Plan's fiduciaries included and retained in the Plan many investment options that were more

expensive than necessary and otherwise were not justified on the basis of their economic value to

the Plan.

56.    Based on reasonable inferences from the facts set forth in this Complaint, during

the Class Period Defendants failed to have a proper system of review in place to ensure that

participants in the Plan were being charged appropriate and reasonable fees for each of the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plan during the Class Period.

57.     As set forth in detail below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VIII.   SPECIFIC ALLEGATIONS

### A.   Improper Management of an Employee Retirement Plan Cost the Plan's Participants Millions in Savings

58.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

59.     The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the

plan participants and their beneficiaries.").[5]

60.     As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

61.     The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year,4 at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%,5 the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.*

62.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[6] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

63.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once

---

[5]      Available     at:     https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 2, 2020).
[6]  Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income   (last visited July 2, 2020).

selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

64.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[7] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

65.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[8]

66.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.     Defendants Breached Their Fiduciary Duties by Failing to Select Lower Cost Passively Managed Funds**

67.     Defendants breached their fiduciary duties by failing to investigate and select lower

---

[7] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited July 2, 2020).
[8] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited July 2, 2020).

cost alternatives to the numerous investment options in the Plan that have expenses approaching those of retail class shares of actively managed funds, *i.e.*, the costs that ordinary individual investors would pay for such investments. Defendants compounded the harm caused by their imprudent fund selection—and wasted the Plan's and participants' assets—by maintaining these high cost options in the Plan year after year, including the funds identified below.

68.    Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotations and citations omitted). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (ERISA "fiduciary duties draw much of their content from the common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law. *Varity Corp.*, 516 U.S. at 496–97.

69.    Under the common law of trusts, the determination as to whether the selection of an investment is appropriate depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b (1) (2012). The relevant factors that may be considered include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

70.    Here, each investment option within the Plan charged certain fees that are paid by deductions from the pool of assets held by the Plan. For passively managed funds, which are designed to track a market index like the Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

71.     By contrast, for the Plan's actively managed funds, which have a mix of securities selected by the fund manager based on his or her belief they will beat the market, the Plan has paid higher fees in order to compensate the fund managers and their associates for the work associated with stock and/or bond picking.

72.     While higher-cost mutual funds may outperform less-expensive passively managed index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in The Washington Post, *Do Any Mutual Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a study by S&P Dow Jones Indices, which analyzed 2,862 actively managed mutual domestic stock mutual funds over a five-year period, found that "just two funds ... managed to hold on to their berths in the top quarter every year for five years running. And for the 2,862 funds as a whole, that record is even a little worse than you would have expected from random chance alone."[9] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index funds trounce actively managed funds: Study* (June 26, 2015) (reporting that data shows that "actively managed funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")[10]

73.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's

---

[9]    Available at: https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited July 2, 2020).
[10]   Available at: https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited July 2, 2020).

expense ratio").

74.    The case for indexing was emphasized by *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018), *cert. denied*, 140 S. Ct. 911, 205 L. Ed. 2d 455 (2020), where the First Circuit applied the common law of trusts in ruling that "it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so. Restatement (Third) of Trusts, § 100 cmt. b(1) (loss determinations can be based on returns of suitable index mutual funds or market indexes)...."

75.    Here, the Plan has retained several actively-managed funds as investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their higher costs relative to the same or similar investments that were readily available to the Plan during the Class Period. This fiduciary failure decreased participant compounding returns and reduced the available amount participants will have at retirement.

76.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. This failure is a strong indication that Defendants lacked a prudent investment monitoring process.

77.    The majority of funds in the Plan stayed relatively unchanged during the Class Period. In 2018, nearly half of the funds in the Plan (at least 9 out of the Plan's 19 funds) were significantly more expensive than comparable funds found in similarly-sized plans (plans having over a billion dollars in assets). As shown in the chart below, the expense ratios for funds in the

Plan in some cases were up to 57% (in the case of the Dodge & Cox Stock) above the median expense ratios in the same category.

| Fund in Plan | Expense Ratio | Category | ICI Median |
|---|---|---|---|
| Dodge & Cox Stock | 0.52 % | Domestic Equity | 0.33% |
| JPMorgan SmartRetirement 2025 | 0.49 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2030 | 0.51 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2035 | 0.52 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2040 | 0.53 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2045 | 0.53 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2050 | 0.53 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2055 | 0.53 % | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2060 | 0.53 % | Target-Date | 0.47 % |

78.    The above comparisons greatly understate the excessiveness of fees in the Plan throughout the Class Period because the ICI Median fee, above, is based on a study conducted in 2016 when expense ratios were generally higher than fees today or even in 2018 given the downward trend of expense ratios over the last few years. Indeed, the ICI median expense ratio for target date funds for plans with over $1 billion in assets was 0.56% using 2015 data compared with 0.47% in 2016. Accordingly, 2018 median expense ratios would be lower than indicated above, demonstrating a greater disparity between the Plan's 2018 expense ratios recited above and the median expense ratios in the same category.

79.    Furthermore, the median-based comparisons, above, also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

**C.    Failure to Adequately Utilize Available Lower Cost Collective Trusts**

80.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is

no difference between share classes other than cost—the funds hold identical investments and have the same manager.

81.    Collective trusts, or "CITs", are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

82.    ERISA is derived from trust law. *Tibble I*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan. Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts, § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id*. (emphasis added).

83.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds. Defendants knew this because one of the primary investment vehicles for this Plan are collective trust target date funds.

84.    In 2018 alone, over $1 billion of Plan assets were invested in private label collective trust target date funds offered by JPMorgan. Defendants, however, breached their fiduciary duties by failing to continually monitor the investment management fees of the target date funds to ensure

they were reasonable. During the Class Period, the expense ratios of the JPMorgan target date funds were more expensive than the Plan could and should have obtained given its bargaining power. As reported on the Plan's forms 5500, the JPMorgan target date funds had the following expense ratios:

| Fund in Plan | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 | 0.49% | 0.52% | 0.57% | 0.62% | 0.67% |
| JPMorgan SmartRetirement 2030 | 0.51% | 0.55 % | 0.59% | 0.67% | 0.67% |
| JPMorgan SmartRetirement 2035 | 0.52% | 0.57% | 0.61% | 0.72% | 0.72% |
| JPMorgan SmartRetirement 2040 | 0.53% | 0.59% | 0.63% | 0.75% | 0.75% |
| JPMorgan SmartRetirement 2045 | 0.53% | 0.60% | 0.63% | 0.75% | 0.75% |
| JPMorgan SmartRetirement 2050 | 0.53% | 0.60% | 0.635% | 0.75% | 0.75% |
| JPMorgan SmartRetirement 2055 | 0.53% | 0.60% | 0.63% | 0.75% | 0.40% |
| JPMorgan SmartRetirement 2060 | 0.53% | 0.60% | -- | -- | -- |

85. A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available lower cost collective trusts. As demonstrated in the chart below, while the target date funds in the Plan are CITs, they are private label collective trusts with much higher expense ratios than the typical CITs offered by JPMorgan. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified these lower cost collective trusts at the earliest opportunity. Here, the following funds in the Plan in 2018 were available as lower cost collective trusts in 2018 and most of the Class Period:

| Fund in Plan | Expense Ratio[11] | Lower Cost Alternatives | Expense Ratio[12] | Inception Date of Fund | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 | 0.49% | JPMorgan SmartRetirement 2025 - CF Class | 0.44% | 7/22/2016 | 11% |
| JPMorgan SmartRetirement 2030 | 0.51% | JPMorgan SmartRetirement 2030 - CF Class | 0.44% | 7/22/2016 | 15% |
| JPMorgan SmartRetirement 2035 | 0.52% | JPMorgan SmartRetirement 2035 - CF Class | 0.44% | 7/22/2016 | 18% |
| JPMorgan SmartRetirement 2040 | 0.53% | JPMorgan SmartRetirement 2040 - CF Class | 0.44% | 7/22/2016 | 20% |
| JPMorgan SmartRetirement 2045 | 0.53% | JPMorgan SmartRetirement 2045 - CF Class | 0.44% | 7/22/2016 | 20% |
| JPMorgan SmartRetirement 2050 | 0.53% | JPMorgan SmartRetirement 2050 - CF Class | 0.44% | 7/22/2016 | 20% |

---

[11] As of 2018.
[12] As of 2019.

23

| JPMorgan SmartRetirement 2055 | 0.53% | JPMorgan SmartRetirement 2055 - CF Class | 0.44% | 7/22/2016 | 20% |
| JPMorgan SmartRetirement 2060 | 0.53% | JPMorgan SmartRetirement 2060 - CF Class | 0.44% | 7/22/2016 | 20% |

86.    The chart below shows that the expense ratios of the Plan's investment options were many times greater than comparable passively-managed alternative funds in the same fund category. The chart below analyzes funds in the Plan in 2018 using 2018 expense ratios (except for the Fidelity Freedom Index Funds, which lowered expenses from 0.14 % to 0.12% effective June 1, 2019), as a methodology to demonstrate the greater relative expense of the Plan's funds compared to their alternative fund counterparts.

| Fund in Plan | Net Expense Ratio | Lower Cost Alternatives | Net Expense Ratio | Inception Date of Fund | % Fee Excess |
|---|---|---|---|---|---|
| Dodge & Cox Stock | 0.52 % | Vanguard Value Index I | 0.04 % | 7/2/1998 | 1200.0 % |
| | | Vanguard Equity-Income Adm | 0.18 % | 8/13/2001 | 188.9 % |
| DFA Global Equity I | 0.30 % | Vanguard Total World Stock Index I | 0.08 % | 10/9/2008 | 275 % |
| JPMorgan SmartRetirement 2020 | 0.44 % | Fidelity Freedom Index 2020 Investor | 0.12 % | 10/2/2009 | 266.7 % |
| | | American Funds 2020 Trgt Date Retire R6 | 0.31 % | 7/13/2009 | 41.9 % |
| JPMorgan SmartRetirement 2025 | 0.49 % | Fidelity Freedom Index 2025 Investor | 0.12 % | 10/2/2009 | 308.3 % |
| | | American Funds 2025 Trgt Date Retire R6 | 0.33 % | 7/13/2009 | 48.5 % |
| JPMorgan SmartRetirement 2030 | 0.51 % | Fidelity Freedom Index 2030 Investor | 0.12 % | 10/2/2009 | 325.0 % |
| | | American Funds 2030 Trgt Date Retire R6 | 0.35 % | 7/13/2009 | 45.7 % |
| JPMorgan SmartRetirement 2035 | 0.52 % | Fidelity Freedom Index 2035 Investor | 0.12 % | 10/2/2009 | 333.3 % |
| | | American Funds 2035 Trgt Date Retire R6 | 0.37 % | 7/13/2009 | 40.5 % |
| JPMorgan SmartRetirement 2040 | 0.53 % | Fidelity Freedom Index 2040 Investor | 0.12 % | 10/2/2009 | 341.7 % |
| | | American Funds 2040 Trgt Date Retire R6 | 0.38 % | 7/13/2009 | 39.5 % |
| JPMorgan SmartRetirement 2045 | 0.53 % | Fidelity Freedom Index 2045 Investor | 0.12 % | 10/2/2009 | 341.7 % |
| | | American Funds 2045 Trgt Date Retire R6 | 0.38 % | 7/13/2009 | 39.5 % |

| | | Fidelity Freedom Index 2050 Investor | 0.12 % | 10/2/2009 | 341.7 % |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2050 | 0.53 % | American Funds 2050 Trgt Date Retire R6 | 0.39 % | 7/13/2009 | 39.5 % |
| JPMorgan SmartRetirement 2055 | 0.53 % | Fidelity Freedom Index 2055 Investor | 0.12 % | 6/1/2011 | 341.7 % |
| | | American Funds 2055 Trgt Date Retire R6 | 0.40 % | 2/1/2010 | 32.5 % |
| JPMorgan SmartRetirement 2060 | 0.53 % | Fidelity Freedom Index 2060 Investor | 0.12 % | 8/5/2014 | 341.7 % |
| | | American Funds 2060 Trgt Date Retire R6 | 0.41 % | 3/27/2015 | 29.3 % |
| JPMorgan SmartRetirement Income | 0.38 % | Fidelity Freedom Index Income Investor | 0.12 % | 10/2/2009* | 216.7 % |

87.    The above alternative funds outperformed the Plan's funds in their 3- and 5-year average returns as of 2020. Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

88.    Defendants should have anticipated such underperformance given the wealth of data showing that over the long-term, actively managed funds do not outperform their passively-managed counterparts. Indeed, as shown in the table below, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark In 5 Years |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 % |
| Mid-Cap | S&P MidCap 400 | 63.56 % |
| Small-Cap | S&P SmallCap 600 | 75.09 % |
| Multi-Cap | S&P Composite 1500 | 82.79 % |
| Domestic Equity | S&P Composite 1500 | 81.66 % |
| Large-Cap Value | S&P Value | 84.74 % |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 % |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 % |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 % |

89.    The table above is for illustrative purposes only as the significant fee disparities detailed herein existed throughout the Class Period. The Plan expense ratios were multiples of

what they should have been given the Plan's bargaining power, which Defendants failed to utilize adequately for the benefit of the Plan and its participants. Indeed, a careful and prudent investigation would have revealed the existence of numerous lower-cost and better performing alternatives to the Plan's funds.

**D.     Defendants Breached Their Fiduciary Duties by Failing to Include a Stable Value Fund Among the Plan's Investment Options**

90.     Stable value funds are a common investment in large defined contribution plans like the Plan—and, in fact, they are designed specifically for such plans. Stable value funds are conservatively managed to preserve principal and provide a stable credit rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between. Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006) (In contrast to money market funds, stable value funds "can invest in longer-term financial instruments," and thus, "Stable Value Funds simply outperform Money Market Funds.").

91.     In addition to longer duration instruments generating greater returns than money market investments, stable value funds provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

92.     Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue,

*Stable Value Re-examined*, 54 RISKS AND REWARDS, at 26, 28 (Aug. 2009).[13]

93.    According to a 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors*, at 5 (2015).[14] The study also notes that stable value returns were "***more than double***" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id*. at 7 (emphasis added).

94.    Unlike the vast majority of large 401(k) plans, the Plan does not offer a stable value fund as its "income producing, low risk, liquid fund."

95.    Instead, during the class period the Plan offered the Vanguard Federal Money Market Fund, which yielded materially lower returns throughout the relevant time period by comparison to typical stable value funds and, thus, was at all times an imprudent retirement investment under ERISA. Therefore, Defendants violated their duty of prudence under ERISA by including it as a retirement investment option in the Plan's menu of investment options.

96.    As shown in the chart below, stable value funds have provided consistently higher yields than money market peer group averages.[15]

---

[13]    *Available at*   http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf (last visited July 23, 2020).

[14] Available at:
https://www.metlife.com/content/dam/metlifecom/us/homepage/institutionalRetirement/insights/StableValue/2015-Stable-Value-Study.pdf (last visited July 23, 2020).

[15] Available at:
https://institutional.vanguard.com/VGApp/iip/site/institutional/investments/StableValue?cmpgn=IIGDTGGINVDCLSRCHPSXXTLXXGENAUDDC020200629SVLPXX&msclkid=3b5fde9f94ac14f48d0b81866f024729 (last visited July 23, 2020).



- ■ Vanguard Retirement Savings Trust
- ■ U.S. fund prime money market—Peer group average
- ■ U.S. fund money market—Taxable peer group average

97.    The table below compares returns of the Plan's Vanguard Federal Money Market Fund to stable value funds that would have been readily available to the Plan throughout the Class Period, and to the Hueler Analytics Stable Value Pooled Fund Universe, as of March 31, 2020.

| Fund | 1-year | 3-year | 5-year | 10-year |
|---|---|---|---|---|
| Vanguard Federal Money Market Fund | 1.39 % | 1.62 % | 1.10 % | 0.55 % |
| Invesco Stable Value Trust – Class A1 | 2.57 % | 2.51 % | 2.28 % | 2.16 % |
| Vanguard Retirement Savings Trust | 2.60 % | 2.40 % | 2.30 % | 2.50 % |
| Putnam Stable Value Fund at 15 BPS | 2.55 % | 2.36 % | 2.15 % | 2.39 % |
| Hueler Stable Value Pooled Fund Universe Average | 2.50 % | 2.30 % | 2.10 % | 2.20 % |

98.    Underperformance of a plan's investment choices can have a dramatic effect on the accumulation of an individual's retirement savings. A difference of only 30 basis points, or three tenths of one percent, is significant in this regard. Consider an investment of $1000 over 30 years that earns 6.5%. This investment would have grown to nearly $6,600. If the same investment only earned 6.2%, the final value would only be $6,050, or 8% less. An 8% difference translates into one full extra monthly payment each year (1/12 = 8%). It is the difference, to a participant, of

receiving 12 payments per year or 11 payments. A 30-basis point lower return eliminates an entire month of retirement income when a participant is living off accumulated retirement savings.

99.     Hueler Analytics is the industry standard for reporting returns of stable value funds. Hueler data represents a reasonable estimate of the average returns of a typical stable value fund. The returns of the funds in the Hueler universe on average far exceeded the returns of the Vanguard Federal Money Market Fund in the Plan during the class period.

100.    In light of stable value funds' clear advantages and enhanced returns compared to the Vanguard Federal Money Market Fund, when deciding which fixed income investment option to include in a defined contribution plan, a prudent fiduciary would have included a stable value fund—and not the Vanguard Federal Money Market Fund. Defendants imprudently and disloyally failed to do this.

101.    Had the funds invested in the Vanguard Federal Money Market Fund instead been invested in a stable value fund returning average benchmark returns, as represented by the Hueler Index during the proposed class period here, Plaintiff and other Plan participants would not have lost millions of dollars of their retirement savings, and would not continue to suffer additional losses as a result of the Vanguard Federal Money Market Fund being retained in the Plan.[16]

**E.    Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses**

102.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These

---

[16] Plan losses have been brought forward to the present value using the investment returns of the Hueler Index to compensate participants who have not been reimbursed for their losses.

services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

103.    Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

104.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

105.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

106.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

107.    Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees."[17]

108.    It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees, and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336.Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

109.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee

---

[17] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited July 23, 2020).

analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

110.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

111.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

112.    Defendants have failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. Alight Solutions ("Alight") has been the Plan's recordkeeper since at least 2014 (with no change). If Defendants had undertaken an RFP

since 2014 in order to compare Alight's costs with those of others in the marketplace, Defendants would have recognized that Alight's direct compensation for recordkeeping services during the Class Period has been unreasonable. From 2014 to 2018 the direct annual recordkeeping per participant fees were as follows:

| Year | Direct Recordkeeping Fees |
|------|---------------------------|
| 2014 | $56 |
| 2015 | $38 |
| 2016 | $40 |
| 2017 | $24 |
| 2018 | $48 |

113.    The direct compensation paid to Alight is, by comparison to other plans, unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease on a per participant basis—a classic example of economies of scale.

114.    For example, a plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) was $12 per participant. 401k Averages Book at 95. For a plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id*. at 108. Extrapolating from this data, the Plan, with over a billion dollars in assets and nearly 17,000 participants during the Class Period, should have had direct recordkeeping costs below the $5 average, but it clearly did not.

115.    Moreover, Alight did not receive only the direct compensation set forth above—it received far more compensation for recordkeeping and other administrative services through revenue sharing payments. Such revenue sharing payments are particularly problematic because they are asset-based, and they often bear no relation to a reasonable recordkeeping fee. Rather,

revenue sharing often results in excessive compensation, and can be used as kickbacks to induce recordkeepers to include the investment company's high-priced funds included as plan investment options.

116.    As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

117.    Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[18] Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id*.

118.    As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based

---

[18] Available at: https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue-sharing (last visited July 23, 2020).

upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that solution would be to consider share classes or investment vehicles with lower—or no—revenue-sharing rates. Daniel Noto, *Rethinking Revenue Sharing*, AllianceBernstein (May 2014).[19]

119.    The Plan's total expenses for recordkeeping reveals the true extent of Defendants' fiduciary breaches. The total amount of recordkeeping fees (both through direct and indirect payments) ranged between an estimated $71 and $126 annually per participant during the Class Period with the lone exception in 2017 when per participant fees were $48.

120.    As noted above, some plans pay recordkeepers fees in addition to direct compensation in the form of revenue sharing. Here, the Plan paid Alight indirect compensation for recordkeeping services. The maximum amount of such indirect compensation received by Alight can be estimated to a reasonable degree of certainty using publicly available information because "revenue sharing' is divvied among all the plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers." 401k Averages Book, at p. 7, Answer to FAQ No. 14.

121.    If all the indirect revenue sharing reported on the Plan's Form 5500 (or a significant portion) were paid to Alight then, prior to rebates, if any, the annual per participant recordkeeping fee would have been as follows during the Class Period:

---

[19] Available at: https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf (last visited July 23, 2020).

| Year | Number of Participants | Direct Compensation | Indirect Costs Through Revenue Sharing | Total Costs for Recordkeeping | Per-Participant / Per Year Cost |
|---|---|---|---|---|---|
| 2018 | 16,741 | $800,632 | $373,253 | $1,173,885 | $71.12 |
| 2017 | 16,261 | $388,821 | $377,332 | $766,153 | $48.12 |
| 2016 | 16,257 | $659,933 | $1,170,956 | $1,830,889 | $113.62 |
| 2015 | 18,749 | $723,592 | $1,191,886 | $1,915,478 | $103.16 |
| 2014 | 15,443 | $867,165 | $1,065,852 | $1,933,017 | $126.17 |

122.     The amounts in the chart above are clearly unreasonable as they are far greater than recognized reasonable rates for large plans. Given the size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided to the Plan by Alight Life. Alight normally performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping and information management (computing, tabulating, data processing, etc.)

123.     The services that Alight provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted separate and independent breaches of the duties of loyalty and prudence.

124.     Contrary to Defendants' flawed approach, the practice embraced by the majority of plans with assets of $250 million or more, like Estee Lauder, is for the plan to pick up all the administrative fees, and not to engage in what amounts to an opaque kickback scheme.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against Estee Lauder and Committee Defendants)**

125.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

126.    At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

127.    As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

128.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to certain mutual funds, even though they generally provide the same investment management services at a lower-cost. Moreover, the Prudence Defendants

37

failed to investigate stable value funds as an alternative to money market funds, even though stable value funds credit participants with substantially higher interest rates without increased risk. Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

129.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

130.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in her Prayer for Relief.

131.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Estee Lauder and the Board Defendants)**

132.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.    Estee Lauder and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

134.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

135.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Estee Lauder and the Board Defendants.

136.    Estee Lauder and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

137.    As a consequence of the foregoing breaches of the duty to monitor, the Plan

suffered millions of dollars of losses. Had Estee Lauder and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Estee Lauder and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in her Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.    Designation of Plaintiff as a Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of

an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: July 24, 2020            By:    */s/Marc H. Edelson*
                                    Marc H. Edelson (NY ID # 2179646)
                                    Eric Lechtzin (*pro hac vice* anticipated)
                                    **EDELSON LECHTZIN LLP**
                                    3 Terry Drive, Suite 205
                                    Newtown, PA 18940
                                    Telephone: (215) 867-2399
                                    Facsimile: (267) 685-0676
                                    medelson@edelson-law.com
                                    elechtzin@edelson-law.com